IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 17, 2004 Session

## DONALD GLIDEWELL v. ANN RUSSELL

**A Direct Appeal from the Circuit Court for Hardeman County**
**No. 9592     The Honorable Jon Kerry Blackwood, Judge**

_____

**No. W2004-00305-COA-R3-CV - Filed December 13, 2004**

_____

Plaintiff-Appellant instituted a detainer action in general sessions court seeking possession of property owned by Plaintiff-Appellant. From an adverse judgment in general sessions court, Plaintiff-Appellant appealed to the circuit court for a trial *de novo*. Defendant-Appellee filed a counter-claim in circuit court, alternatively requesting that if she is forced to vacate the premises, she should be awarded damages for improvements made to the premises. The trial court entered judgment for possession to the Defendant-Appellee. Plaintiff-Appellant appeals. We reverse.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Harriet S. Thompson of Bolivar for Appellant, Donald Glidewell

Terry Abernathy of Selmer for Appellee, Ann Russell

**OPINION**

On February 8, 2002, Plaintiff, Donald Glidewell, ("Glidewell," "Plaintiff", or "Appellant") filed a forcible entry and detainer suit against Ann Russell, ("Russell," "Defendant," or "Appellee") in the Hardeman County General Sessions Court. From an adverse judgment in the general sessions court, Glidewell appealed to the circuit court for a hearing *de novo*. Russell filed a counter-claim in the circuit court stating that the general sessions court judgment was correct but, alternatively, asserting that should there be a judgment for Glidewell, Russell should be reimbursed for the value of the improvements made to the property involved. After a non-jury trial on January 7, 2004, the court entered its order on January 14, 2004, in favor of Russell. Glidewell appeals and presents one issue for review, as stated in his brief:

Whether the trial court erred in holding that Defendant has the right to live in Plaintiff's house until her death by virtue of the doctrine of promissory estoppel.

With a few minor exceptions, the facts of the case are not in dispute. Russell does not dispute the statement of facts set out in Glidewell's brief, except to the extent of adopting the statement of facts made by the court in its order. For a factual history of the case, therefore, we will restate the facts as set out in Glidewell's brief:

Russell and Lola Glidewell lived on a farm in the Essary Springs area of Hardeman County. They raised three children on that property: Donald, the oldest and Plaintiff herein; Shelby, the middle, adopted son; and Hugh, the youngest. Although Plaintiff and Shelby moved away from their parents' home upon reaching adulthood, Hugh lived with his parents virtually his entire life. He did so because he lacked the ability to care for himself, both financially and otherwise. Hugh's inability to care for himself was either caused, or greatly exacerbated, by the fact that he was an alcoholic. Several witnesses at trial testified that Hugh was a hard worker and a good person while sober, but that he would go on alcoholic binges for weeks at a time and not work at all. Hugh's problems led him to depend upon Plaintiff, his older brother, a great deal. Because of the brothers' special relationship, Plaintiff tried to help Hugh as much as possible throughout their lives.

In 1966, after getting married and moving away, Plaintiff purchased approximately 130 acres of his parents' property. This property is adjacent to the approximately twenty-five acre tract upon which Russell and Lola Glidewell's residence was located. Thereafter, Plaintiff improved the property and kept cattle on it. Sometime in the late 1970s or early 1980s, either Shelby or Hugh bought a very small, old house and moved it onto Plaintiff's 130 acre tract. Originally, this structure served as a storage shed for hay and farm equipment.

Because Hugh had tremendous energy and needed something to occupy his time when he was not drinking, he became interested in fixing up the house. Thus, Hugh often "tinkered" with the house over the years, improving it in various ways. Plaintiff never objected to Hugh's activities because he wanted his brother to have something to

occupy his time, and because the improvements benefitted his land.[1] Subsequently, Hugh also began to use the house as a place to drink with his friends. By retreating to the house, Hugh believed his parents would not know that he was drinking. Because he often used the house as a "retreat," and because he worked on it, Hugh apparently began to believe that the house was his.

For his part, Plaintiff allowed his brother to use the house as a "getaway" because he was sympathetic to his unfortunate situation. However, Plaintiff never promised Hugh the right to live in the house, either verbally or in writing.

In the mid-1990s, Plaintiff's mother became ill. Perhaps because of their worsening health, Russell and Lola Glidewell deeded the twenty-five acre tract upon which their residence was situated to Plaintiff. However, the Glidewells reserved life estates in the property for themselves and Hugh, thus providing Hugh with a place to live until his death. Furthermore, Hugh was informed of his life estate when the transaction was consummated.

At about this same time, Defendant began visiting the Glidewells on a regular basis and providing care for Lola. Defendant knew the Glidewells because she had grown up in the Essary Springs area and had been married to Shelby.

During her visits, Defendant became reacquainted with Hugh, whom she had known previously. Gradually, their relationship blossomed and they decided to move in together. Because Lola Glidewell would not permit unmarried couples to live in her house - the house in which Hugh had a legal right to live - in early 1997, the couple decide to renovate the "retreat" house and move into it.

For the next seven or eight months, Hugh, Defendant, and Donny Wood, Defendant's nephew – worked on the house, making significant improvements to it. Specifically, they added rooms, wired and plumbed the house, covered the interior walls with wood, installed windows, and added other cosmetic touches, such as landscaping and decorating items. According to Defendant, she and Hugh paid some $28,000 to Donny Wood for his work on the house.

---

[1] In fact, Plaintiff and Hugh worked together at times to improve the property. For example, together they built a barn behind the house.

By the fall or early winter of 1997, the renovation was essentially complete.

During the period in which the renovation was occurring, [Plaintiff] visited his parents and Hugh periodically from his home in Senatobia, Mississippi, which is two hours from Essary Springs. While Plaintiff was generally aware that some sort of renovation was going on, he did not know the full extent of the work, as he did not enter the house until the fall of 2000. Moreover, while Plaintiff did not object to the work, he never promised either Hugh or Defendant the right to live in the house. In fact, at some point, Plaintiff flatly told Hugh and Defendant that all the property, including the two tracts and the houses located thereon, belonged to him. Thus, as he had with the "retreat" situation, Plaintiff simply allowed his brother to stay in the house because of family loyalty and because he was sympathetic to Hugh's situation.

In 1999, Lola died and the following year Russell also passed away. In the fall of 2000, Hugh became very ill and was soon confined to his bed. After Hugh became sick, Plaintiff entered the house and discovered the extent of the renovations. Thereafter, Hugh's condition deteriorated and, on June 3, 2001, he died. In May 2001, some two to three weeks before Hugh's death, Plaintiff told Defendant that he had promised Hugh that she could live in the house for as long as she wanted or until her death. Another witness, Mary Flake, testified that Plaintiff made such a promise to Defendant during the last weeks of Hugh's life.

After Hugh's death, Defendant made a few improvements to the property. Initially, she added a back porch. However, Defendant's son constructed this porch as a birthday gift to his mother. Thus, presumably this porch cost Defendant nothing, and she submitted no evidence at trial of any expense relating thereto. Defendant also had a water line and meter installed. The meter cost $300, but she was unable to produce any expenses relating to the installation of the line.

Defendant also painted a kitchen wall, the kitchen ceiling, and purchased window screens and three screen doors. She produced no evidence at trial regarding the cost of these improvements. Finally, Defendant installed a chicken coop behind the house. However, she submitted no evidence regarding the expense of this, and Plaintiff

testified that she procured the material from a barn on his parents' old place.

In early 2002, Plaintiff decided that he again wanted to keep cattle on the 130 acre tract. Because the house interfered with this purpose, and in fact constituted a financial burden under the circumstances, Plaintiff asked Defendant to leave the property. Defendant refused and this litigation followed.

The final order entered by the trial court states as follows:

This is an action for unlawful detainer filed by the plaintiff. It seeks possession of a house located on property they own by virtue of a registered deed. The defendant has lived in this house since 1996, when she began to live with Hugh Glidewell, the plaintiff's brother. This property adjoins the plaintiff's parents' property. The plaintiff obtained the parents' property subject to a life estate of the parents and Hugh Glidewell. Unfortunately for Hugh, he was given to periodic alcoholic binges requiring that he stay in the parents' home.

Sometime in 1974, the plaintiffs moved the subject "house" to the property that adjoined their parents. In order to drink, Hugh would stay in this house with his drinking buddies. He would also idle away his free time at the house.

In the early 1990s, the plaintiff's mother became ill, requiring care and attention. The defendant had previously been married to Shelby Glidewell, another brother of plainitff. The defendant began to visit the plaintiff's parents. After a short time, she began a relationship with Hugh Glidewell. For a short time, they stayed in the parents' home. Eventually, they moved to the subject house. They maintained a live-in arrangement until Hugh's death. The defendant continued to live in the house until the plaintiff demanded that she move.

Before finding the essential facts necessary to resolve this matter, the Court must comment on the credibility of the witnesses. The salient points of controversy are sharply disputed, only after a resolution of the issue of credibility, can the matter be resolved. The court has resolved these disputes in the testimony in favor of the defendant. Plaintiff's testimony was equivocal, evasive, argumentative and sometimes ludicrous.

When the Court speaks of the subject "house," the Court uses the word "house" loosely. Exhibits clearly indicate that when this house was moved to the property that it was hardly habitable. Hugh Glidewell always thought of this house as his home and at various times, made modest improvement. However, after 1996, when the defendant began her relationship with Hugh, substantial improvements were made, transforming a "shack" into a commodious home. From 1996 until the filing of the lawsuit, the interior of the home was remodeled, rooms were added, windows and doors and screens were purchased. Plumbing, electricity and water were added. The property was landscaped. A garden was cultivated. An adjoining barn was renovated. The defendant and Hugh paid over $28,000.00 to have these improvements made. The defendant performed some of the manual labor. While these improvements were being made, the defendant assumed that Hugh Glidewell owned the house. It was, or should have been, obvious to the plaintiff that this house was undergoing a dramatic transformation. The defendant spent much of her "buried" savings in this house, purchased applicances and ceiling fans, and other items necessary for the home. Shortly before Hugh died, the plaintiff on two or more occasions told neighbors that the defendant would be well-taken care of upon Hugh's death, and that she could live in the house for as long as she wanted, until she died. The Court further finds that the plaintiff told her both before and after Hugh's death that she could live in the house. Even after Hugh's death, the defendant had a waterline dug to the house to provide water. The plaintiff was aware of this line, and had, in fact, told her to put the meter in her name. Plaintiff further told the defendant where to locate a chicken pen and was aware that the defendant was going to remodel the porch. At no time did plaintiff ever inform the defendant that this house was his. As a result of both plaintiff's assertions and his silence, the defendant relied on his conduct and as a result, has suffered significant detriment as a result of the promises and omissions.

"When one makes a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and where such promise does, in fact, induce such action or forbearance, it is binding if injustice can be avoided only by the enforcement of the promise." **McBee v. Elliot Lexis 242.**

The plaintiff made a promise to the defendant, i.e., that she could live in the house. Certainly, plaintiff could reasonably expect

that the defendant would take action to rely on that promise. She did take action by adding water and remodeling the porch. More detrimental, however, was the silence of the plaintiff as [he] watched his brother and defendant expend significant money and labor to transform a $1,200 shack (appraised value) into a valuable, comfortable home.[2] One word from the plaintiff could have stopped this injustice, but instead, plaintiff allowed his silence and his admission to imply a right for the defendant to live in this home.

The Court concludes that the plaintiff is estopped to deny the defendant the right to this house. The promise is that defendant shall have a right to live in this home for as long as she wishes, or until she dies. That is the contract that the plaintiff must fulfill.

Judgment rendered for the defendant, with costs assessed against the plaintiff.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the trial court's findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d). We further note that when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id*.; *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

Russell asserts that Glidewell sat silently and idly by and watched the transformation of an old and uninhabitable shack into, in the words of the trial court, a "commodious home." Russell relies upon the doctrine of equitable estoppel and quotes extensively from *Church of Christ v. McDonald*, 171 S.W.2d 817 (Tenn. 1943) as follows:

We think the weight of modern authority is that, even though no fraud is intended, yet one may be estopped from claiming property where by intentional concealment of facts he has induced another to act to his prejudice. It is unnecessary to state the well known essential elements which must exist which lie at the basis of the doctrine of

---

[2] There is no proof in the record that plaintiff was made aware that defendant was expending her money for the house.

-7-

equitable estoppel. Mr. Pomeroy's Equity Jurisprudence, Vol. 3, p. 189, says:

> "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

The learned author further says:

> "It is not absolutely necessary that the conduct mentioned in the first subdivision should be done with a fraudulent purpose or intent, or with an actual and fraudulent intention of deceiving the other party. The adoption of such an element as always essential would at once strike out some of the most familiar and best established instances of equitable estoppel." Pomeroy's Eq.Jur., Vol. 3, pp. 193, 194.

The doctrine of estoppel is often spoken of as a branch of the law of fraud. This is true if and when "fraud" is used in the general sense of what is "inequitable" or "unjust"; but it is not accurate if by fraud is meant deceit. Bispham's Principles of Equity, 10th Ed., § 280, p. 479.

Mr. Chief Justice Perley, in the leading case of ***Horn v. Cole***, 51 N.H. 287- 289, 12 Am.Rep. 111, says:

> "The doctrine has not in equity been limited to cases where there was an actual intention to deceive. * * * The general current of our decisions on the subject tends to a liberal application of the doctrine for the suppression of fraud and dishonesty, *and the promotion of justice and fair dealing*." (Italics ours.)

See, also, ***Rogers v. Colville***, 145 Tenn. 650, 661, 238 S.W. 80.

The doctrine of equitable estoppel is founded upon the soundest principles of justice and morality, rather than upon technical rules of law. The intentional concealment of the truth often operates as an estoppel. "If a man is silent when it is his duty to speak, he shall not be permitted to speak when it is his duty to be silent." Bispham Eq., 10th Ed., § 284. While one is not in duty bound under all circumstances to speak out, we hold that, where one's silence enables him to acquire an unfair advantage over another in the settlement of property rights, it is his duty to speak. The foregoing principle has often been applied. A man who holds himself out as a partner is estopped, as against those who have dealt on the faith of such holding out, from denying the partnership. Under the same head fall cases in which a party has been held to be precluded from denying that he occupied a certain position by reason of his having permitted himself to be held out to others as having occupied it. *Towne v. Sparks*, 23 Neb. 142, 36 N.W. 375; Bridger's Case, L.R. 9 Eq. 74; Washburn on Easements, 62, 63. See our own case of *Electric Light & Power Co. v. Bristol Gas, Electric Light & Power Co*., 99 Tenn. 371, 42 S.W. 19, 21, wherein the Court held that one "will not be allowed to assert his lien to the prejudice of persons whom he has induced to believe that his debt has been satisfied, or that he will claim no lien and who, in that belief, have purchased that property on which the lien rests." The Court further held the right to invoke the doctrine "does not always rest on the intention of the party to be affected by it, but is dependent, rather, upon the reasonable or legitimate effect of his statement or conduct in the particular matter upon the course of [others]." (Italics ours.)

The term "conduct", when applied to a person in relation to the modern doctrine of equitable estoppel, embraces not only ideas conveyed by words written or spoken and things actually done, but includes the silence of such person and his omission to act, as well. *Wampol v. Kountz*, 14 S.D. 334, 339, 85 N.W. 595, 86 Am.St.Rep. 765; footnote, 31 C.J.S., Estoppel, § 87, p. 305, quoting *Farr v. Semmler*, 24 S.D. 290, 123 N.W. 835, 838.

In *Tobias v. Josiah Morris & Co.*, 126 Ala. 535, 28 So. 517, 522, it was said: *822 "Negligent silence may work an estoppel as effectually as an express representation. * * * So, too, acts or conduct, though nothing is said, if they are calculated to mislead, and do in fact mislead, will work an estoppel, notwithstanding there was no intention to do so."

171 S.W.2d at 821-22.

While we agree with the above authority, we must disagree with Russell's assertion. It is undisputed that Glidewell allowed his brother, Hugh Glidewell, to occupy the property and that, subsequently, Russell moved into the house with Hugh Glidewell. Although the extent of Glidewell's knowledge of the improvements being made is in dispute, there is nothing in the record to indicate that Glidewell was put on notice that Russell was expending money and labor on the property. We also note that Russell testified that she was under the impression that Hugh Glidewell owned the property. Therefore, anything that she did she was doing to improve the property for Hugh Glidewell.

We comment upon the trial court's obversation concerning credibility. We reviewed the written record of this case and, while we are confined to what is placed on the written page, we fail to see the extent of "equivocal, evasive, argumentative and ludicrous" testimony. At any rate, as we have previously stated, there is nothing in the record to indicate that Glidewell had any knowledge of any improvements or expenditures made by Russell until after the death of his brother, Hugh. There is no dispute that about a week or so prior to Hugh's death, Glidewell told Hugh and Russell that Russell could occupy the property as long as she wanted to or until her death. After Hugh's death, this was reiterated by Glidewell to Russell. Russell relied upon Glidewell's statement and expended money for a water line and for some additional improvements to the building. Glidewell relies upon the doctrine of promissory estoppel. In *Calabro v. Calabro*, 15 S.W.3d 873 (Tenn. Ct. App. 1999), this Court said:

> Promissory estoppel is explained as:
>
> > [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.
>
> *Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. App. 1991) (quoting *Restatement (Second) of Contracts* § 90); see also *Alden v. Presley* 637 S.W.2d 862, 864 (Tenn. 1982).
>
> There are limits to the application of promissory estoppel:
>
> > Detrimental action or forbearance by the promisee in reliance on a gratuitous promise, within limits constitutes a substitute for consideration, or a sufficient reason for enforcement of the promise without consideration. This doctrine is known as

-10-

promissory estoppel. A promisor who induces substantial change of position by the promisee in reliance on the promise is estopped to deny its enforceability as lacking consideration. The reason for the doctrine is to avoid an unjust result, and its reason defines its limits. No injustice results in refusal to enforce a gratuitous promise where the loss suffered in reliance is negligible, nor where the promisee's action in reliance was unreasonable or unjustified by the promise. The limits of promissory estoppel are: (1) the detriment suffered in reliance must be substantial in an economic sense; (2) the substantial loss to the promisee in acting in reliance must have been foreseeable by the promisor; (3) the promisee must have acted reasonable in justifiable reliance on the promise as made.

*Alden* 637 S.W.2d 864 (citing L. Simpson, Law of Contracts § 61 (2d ed. 1965)).

*Id.* at 878-79.

It is undisputed that Glidewell made the statements to Russell concerning her occupancy of the property subsequent to Hugh's death, and the statements were of such a nature that it is reasonable to assume that she would rely upon them. Reliance on these statements, however, did not require her to make any move whatsoever, as she had been living on the property with Hugh up until the time of his death; and following Hugh's death, Russell lived there alone, without paying any rent or expense whatsoever for the use of the property. However, she did make some expenditures in reliance on statements made by Glidewell. Consequently, Glidewell's change of mind concerning her continued occupancy of the property constitutes a breach of the promise he made. However, as noted in **Calabro, supra**, "the remedy granted for breach may be limited as justice requires." *Id.* at 878.

While it appears unjust to remove Russell from this property, it also appears unjust to deprive Glidewell and his wife of the property, for what could be a good number of years, especially since the Glidewells legally own the property. Therefore, we think the remedy for the breach of the promise should be the detriment incurred by Russell by virtue of her reliance on the promise (i.e., the expenditures that she has made since the date of the promise on which she relies). However, the record is incomplete as to the damages allegedly sustained, which we will consider as an oversight without culpable negligence. Under these circumstances, T.C.A. § 27-3-128 is applicable. That section provides:

**Remand for correction of record.**

-11-

The court shall also, in all cases, where, in its opinion, complete justice cannot be had by reason of some defect in the record, want of proper parties, or oversight without culpable negligence, remand the cause to the court below for further proceedings, with proper directions to effectuate the objects of the order, and upon such terms as may be deemed right.

Accordingly, the order of the trial court is reversed, and the case is remanded to the trial court for entry of an order granting Glidewell possession of the disputed property and for a hearing to determine the amount of damages necessary to compensate Russell for expenditures made subsequent to and in reliance upon Glidewell's statements made after the death of Hugh Glidewell. Costs of the appeal are assessed one-half to Appellant, Donald Glidewell, and his surety, and one-half to Appellee, Ann Russell.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.